Robert L. Hyde, Esq. (SBN: 227183)
bob@westcoastlitigation.com
Joshua B. Swigart, Esq. (SBN: 225557)
josh@westcoastlitigation.com
David C. Leimbach, Esq. (SBN: 265409)
dleimbach@westcoastlitigation.com
**Hyde & Swigart**
411 Camino Del Rio South, Suite 301
San Diego, CA 92108-3551
Telephone:   (619) 233-7770
Facsimile:    (619) 297-1022

Attorneys for the Plaintiff

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Dara Billing, Individually and on Behalf of All Others Similarly Situated<br><br>Plaintiffs,<br><br>v.<br><br>CSA - Credit Solutions of America, Inc., d.b.a. Credit Solutions of America Inc., d.b.a. Credit Solutions<br><br>Defendant. | **Case Number: 10-cv-0108-BEN-NLS**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br>FOR:<br><br>**(1)** Violation of California Business and Professional Code, 17200 *et seq.*;<br>**(2)** Violation of Consumer Legal Remedies Act, Cal. Civ. Code § 1770(a)(7); 1770(a)(19);<br>**(3)** Violation of the Credit Repair Organizations Act, 15 U.S.C. § 1678, *et seq.;*<br>**(4)** Tortuous Interference With Contractual Relations;<br>**(5)** Tort in Essence;<br>**(6)** Negligence;<br>**(7)** Injunctive Relief;<br>**(8)** Declaratory Relief. |

## INTRODUCTION

1.     An emerging billion dollar industry in the United States is becoming known as the "debt settlement," or "debt negotiation" industry.  The debt settlement industry consists of companies who represent that they can negotiate the balance of outstanding unsecured consumer debt, in exchange for various initiation and maintenance fees, as well as a percentage of the amount of debt discharged through negotiation.    Debt settlement firms typically require consumers to pay from 15-20 percent of the total debt enrolled in the program before any negotiations with the creditor occur.

2.     In contrast to debt management plans in which consumers make monthly payments to creditors, the debt settlement business model generally requires that a consumer stop making regular payments to creditors.    Instead, the consumer makes payments directly to the debt settlement company or into a separate account arranged by the settlement company.    The consumer continues to pay into the account until the debt settlement company believes there are sufficient funds to attempt to negotiate and settle the consumers debts in lump sum payments.  Almost all debt settlement companies charge a large portion of their fees in advance before they perform any significant services on behalf of the consumer, which typically include initiation fees, maintenance fees, service fees, as well as a percentage based on the amount of unsecured debt enrolled in the program - typically between 15-20 percent of the total enrolled debt.

3.     In a letter from the National Association of Attorneys General, joined by forty - one Attorney Generals to the Federal Trade Commission on October 23, 2009 (the "NAAG Letter"), it was stated that "[t]he States enforcement actions provide ample evidence of the types of unfair and deceptive practices that financially distressed consumers encounter when they seek credit solutions via debt relief services.  The primary consumer protection problem areas that have given rise to the State's actions include: (1) unsubstantiated

HYDE & SWIGART
San Diego, California

HYDE & SWIGART
San Diego, California

claims of consumer savings; (2) deceptive representations about the length of time necessary to complete a debt relief program; (3) misleading or failing to adequately inform consumers that they will be subject to continued collection efforts, including lawsuits, and that their account balances will increase due to extended nonpayment under the program; (3) deceptive disparagement of consumer credit counseling; (5) deceptive disparagement of bankruptcy as an alternative for debtors; (6) lack of screening and analysis to determine suitability of debt relief programs for individual debtors; (7) the collection of substantial up-front fees so the debt relief company gains even if it fails to perform; (8) lack of transparency and information for consumers as to payment of fees, status of accounts, and communications with creditors; (9) significant delays in active negotiation or engagement with creditors, coupled with prohibitions on direct consumer communications with creditors; and (10) in the case of debt settlement companies, basing savings claims (and settlement fees) not on the original account balance, but on the inflated amount due (including late fees and default rates of interest) at the time of settlement."

4.     The number of complaints the States have received against debt relief companies, particularly debt settlement companies, have consistently been rising and have more than doubled since 2007.   Over the past five years, 21 States have brought 128 enforcement actions against 84 debt relief companies for unfair and deceptive trade practices.

5.     The better Business Bureau categorizes debt settlement and debt negotiation companies as "Inherently Problematic Businesses."   Data provided to the States by the Better Business Bureau shows that, since 2007, among other businesses that have been labeled inherently problematic by the Better Business Bureau, debt settlement and debt negotiation companies have annually generated the most complaints received by the Better Business Bureau.

6. Credit Solutions of America, Inc., a self-proclaimed "industry leader, managing more than $2.25 billion of debt," is at the center of this problematic industry. In fact, Credit Solutions of America, Inc., is currently under fire across the country for its fraudulent practices. The Attorney Generals for the States of New York, Missouri, Texas, Maine, Illinois and Florida have all filed lawsuits against Credit Solutions of America, Inc.

7. Dara Billing ("Plaintiff"), individually and on behalf of all others similarly situated, through her attorneys, brings this complaint to challenge the actions and omissions of CSA-Credit Solutions of America, Inc., d.b.a. Credit Solutions of America, Inc., d.b.a. Credit Solutions ("CSA"), with regard to CSA's violations of the California Business and Professional Code 172000 *et seq.* (the "Unfair Competition Law," hereinafter referred to as "UCL"), and California Prorater Law under California Financial Code 12000 *et seq.* (hereinafter "California Prorater Law"). CSA is further liable to Plaintiff for violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1770, *et seq.* ("CLRA"), Credit Repair Organizations Act, 15 U.S.C. § 1678 *et seq.* ("CROA"), Intentional Interference With Contractual Relations, Tort in Essence and Negligence Per Se under California Evidence Code § 669.

8. Any business model that requires cash strapped consumers to pay substantial up-front fees raises significant consumer protection concerns. Unfortunately, due to the relatively recent proliferation of these debt settlement companies, the enforcement of consumer rights and regulation of these companies scattered at best. One of the few states that has a comprehensive statutory scheme to regulate these companies is California, and these regulations are found in the California Financial Code § 12000 *et seq*, known as the Check Sellers, Bill Payers, and Prorater Law ("California Prorater Law").

9. Everyone, consumers and creditors alike, are victims of companies such as CSA. Consumers fall prey because they are deprived of thousands of dollars (at times when they are most financially vulnerable), unknowingly end up

HYDE & SWIGART
San Diego, California

1  having their credit ruined, oftentimes get sued, and may even have the
2  declare bankruptcy.   Creditors are prey because they either have to accept
3  drastically reduced payment on legitimate debt or they must incur legal fees
4  to sue consumers who are merely unsophisticated consumers that foolishly
5  trust companies like CSA. The only entity that does well is CSA, and well
6  they do. They are paid thousands of dollars by unsuspecting consumers.

10.  Plaintiff makes these allegations on information and belief, with the exception
of those allegations that pertain to Plaintiff, or to Plaintiff's counsel, which
Plaintiff alleges on personal knowledge.

11.  Unless otherwise stated, Plaintiff alleges that any violations by CSA were
knowing and intentional, and that CSA did not maintain procedures
reasonably adapted to avoid any such violation.

### JURISDICTION AND VENUE

12.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the cause of
action arises under laws of the United States, specifically, 15 U.S.C. § 1697 et
seq.

13.  Additionally, this court has original jurisdiction over the lawsuit because the
action arises under the Class Action Fairness Act of 2005 ("CAFA"), 28
U.S.C. § 1332.   Upon information and belief, the matter in controversy
exceeds the sum of $5,000,000, exclusive of interest and costs.  Plaintiff seeks
actual, statutory and punitive damages in excess of $5,000 which, when
aggregated among a proposed class number in the tens of thousands, exceeds
the $5,000,000 threshold for federal court jurisdiction. Furthermore, as this a
class action involving 100 or more potential class members in which Plaintiff,
a citizen of the State of California, is a citizen of a state different from
Defendant, a citizen of State of Texas, both elements of diversity jurisdiction
under the CAFA are present, and this Court has jurisdiction.

HYDE & SWIGART
San Diego, California

14. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

15. This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in this State, have sufficient minimum contacts with this State, and otherwise purposefully avail themselves of the markets in this State through the promotion, sale, and marketing of their services in this State, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this District under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Plaintiff resides in this District.

### PARTIES

17. Plaintiff is a natural person and resident of the the State of California. Plaintiff is an individual who at all times mentioned, is and was a resident of San Diego County, within this judicial district, at all relevant times relating to this Complaint.

18. Plaintiff is a consumer as that term is defined in Cal. Civ. Code § 1761(d).

19. Defendant CSA-Credit Solutions of America, Inc., is a Texas corporation that does business throughout the United States of America. In February of 2005, Douglas Van Arsdale formed Credit Solutions of America as a limited partnership. In April of 2005, the limited partnership was converted to a for-profit corporation, with Douglas Van Arsdale as the Chief Executive Officer. CSA is located in Richardson, Texas.

20. CSA is a person or entity who, "for compensation, engages in whole or in part in the business of receiving money or evidences thereof for the purpose of distributing the money or evidences thereof among creditors in payment or partial payment of the obligations of the debtor," and is therefore a "Prorater" as that term is defined in Cal. Fin. Code § 12002.1.

HYDE & SWIGART
San Diego, California

21. CSA is a "credit repair organization" within the meaning of 15 U.S.C. § 1679 (a)(3) because it expressly and/or impliedly represents that it will provide services that will improve the credit records, histories, or scores of its customers in exchange for compensation.   CSA also expressly and/or impliedly represents that it will advise or assist consumers in improving their credit scores or histories in exchange for compensation.

## NATURE OF CREDIT SOLUTIONS' OPERATIONS

22. CSA operates a for-profit debt settlement company.   CSA's debt settlement program ("CSA's Program") is a form of consumer debt relief, targeted to consumers with thousands of dollars of unsecured debt.

23. On its websites, in the sales scripts, and in its contacts with consumers, CSA represents to consumers that it will get the consumer our of debt within 36 months by reducing the amount of unsecured debt with which the consumer enrolls in the program by 50-60 percent.   CSA does not disclose that the cost of getting out of debt will most likely be far higher than the numbers it uses to sell its program.   In fact, it has recently been asserted by the Attorney General for Texas that CSA's own data shows that over <u>80%</u> of the debts enrolled in the program do not settle.

24. Because CSA's Program only works if consumers are not making monthly payments on their unsecured debts (since creditors will not want to settle a debt if they are receiving monthly payments), there are inherent risks involved with participating in a CSA's Program that can have catastrophic effects on the consumer.   CSA fails to adequately disclose to consumers the myriad of possible negative consequences of its debt settlement program, and consumers entering a CSA's Program may experience any or all of the following:

   a.   Creditors will continue to assess interest, late fees, over-limit charges, and any other fees associated with the account.   As a result, at the time

HYDE & SWIGART
San Diego, California

that a settlement is reached, the consumer owes significantly more on their account, thus reducing the actual savings;

b.    Creditors are under no obligation to accept, or even entertain, CSA's settlement offer;

c.    Because they are no longer receiving monthly payments, creditors will likely engage in collection activities which may include repeated phone calls and other correspondence.  Over time, these activities can increase, especially as the consumer's account may get transferred to a collection agency;

d.    Once a consumer stops paying on their accounts, the creditor may file a lawsuit against the consumer for breaking their contract;

e.    The consumers credit reports will reflect the late charges and non-payment of their unsecured debt.   As a result, the consumer's credit score will drop while participating in the program and the consumer may experience the long term effects of a low credit score, which can include difficulty in buying a house or car, obtaining insurance, or obtaining employment;

f.    The debt forgiveness that occurs as part of the settlement is taxable as income;

g.    Even credit cards that are not enrolled in CSA's program, and are not delinquent, may be cancelled by creditors because of information sharing between these companies and various credit reporting bureaus, substantially depriving consumers of necessary financial resources;

h.    CSA dramatically overstates its ability to settle a consumers debt, while simultaneously deceiving consumers into believing that the consumer would be unable to perform similar tasks;

i.    CSA requires that consumers pay substantial up-front fees before CSA will perform any promised services, despite CSA's knowledge that any consumer enrolled in CSA's program is undergoing substantial

**HYDE & SWIGART**
San Diego, California

HYDE & SWIGART
San Diego, California

financial problems.   These fees are non-refundable, regardless of whether CSA performs any services for consumers;

j.    CSA misrepresents and exaggerates the purported positive effects CSA's Program will have on consumers credit once the program is completed;

k.    CSA fails to disclose that debt settlement will cause good and even fair credit scores to drop precipitously, and that reports of late payments, charge offs, lawsuits, and judgments can remain on their credit report for years;

l.    CSA makes deceptive representations about the length of time necessary to complete CSA' Program;

m.    CSA engages in deceptive disparagement of alternatives to CSA'sProgram, including but not limited to, bankruptcy, credit counseling,  and self-initiated payment arrangements with creditors;

n.    CSA fails to inform consumers that creditors and other third party debt collectors are unlikely wait 18-36 months to collect on debts, and instead file lawsuits against these consumers while they are enrolled in their programs, thus, rendering any "negotiation" of such debt futile.

25.  Based on CSA's current business model, there is minimal incentive to render promised services because by charging up-front fees, CSA is compensated regardless of whether they negotiate anything for the consumer, succeed in settling any of the consumers debts for a reduced amount, or take any action on behalf of the consumer.   The end result is that CSA collects its up-front fees and then, by virtue of either circumstance or design, shuts its doors to consumers.

26.  CSA's business model is fraudulently premised on two basic misrepresentations: (1) that CSA possess special skills and knowledge that enables them to negotiate a reduced balance to settle an outstanding debt - a task the consumer is unable to perform; and (2) that the consumer will realize

HYDE & SWIGART
San Diego, California

a substantial reduction in the amount of debt they ultimately pay. Both of these concepts are a blatant mischaracterization of the true nature of CSA's services, and are part of a fraudulently calculated scheme to entice the most desperate and unsuspecting consumers to enroll in CSA's Program.

27.  CSA misrepresents its "unique" abilities to settle consumers' debt.  Creditors, especially third party debt collectors, are more than willing to settle an outstanding debt for a fraction of the debt's actual balance.  This is because the majority of these delinquent accounts are purchased for pennies on the dollar, so even a 50% settlement will yield an enormous profit.  Consumers can, and every single day, actively do engage this task without any assistance. Creditors and debt collectors alike are more than willing to negotiate directly with consumers.  As the Department of Consumer Affairs put it, "[a]n apt analogy would be a physician who has all of his patients visit him daily to administer an aspirin tablet."

28.  Additionally, CSA's Program is designed in a manner so CSA would rarely have to deal with original creditors and instead, only deal with third party debt collectors who purchase debts for around four cents on the dollar.  As discussed in greater detail below, CSA will not even consider negotiating with creditors until its entire service fee is paid in full, and the consumer has accumulated enough money to begin settling accounts.  But by the time this would occur, original creditors would have gone a year or more without receiving any payment from the consumer (as per the instructions of CSA), and thus, deemed such an account uncollectible and sent to a debt collector. In essence, CSA's Program is designed to allow consumer debts to "charge-off" from the original creditor, because it's much easier to settle accounts with third party debt collectors.

29.  The second premise, which, as a practical matter is the only purpose for engaging CSA's services, is even more fraudulent. The reality is that consumers never realize the kind of savings that CSA represents. This is

HYDE & SWIGART
San Diego, California

because when a consumer ceases to make monthly payments to creditors, the balance of that debt grows exponentially.  This is due to continuing and compounding late fees, charge off fees, penalties, accruing interest over 20%, and various other charges and fees associated with the account. This is especially true when a consumer is not yet delinquent on a consumer debt, and is seeking CSA's assistance to prevent such a liability from falling into arrears.   When a consumer fails to make monthly payments to creditors for years, as per the instructions of CSA, the amount owed at the time of settlement is significantly higher than when the consumer entered CSA's Program.

30.     For example, a consumer may enter into CSA's Program with a credit card debt of $500.00. Based on the CSA's representations, that consumer will reasonably expect to settle this debt for around $250.00.  However, after two to four years of failing to make payments to that creditor, all of the post-delinquency charges assessed to that account turn that $500 debt into a $750 - $1,000 debt by the time the account is "ripe" for settlement.  So even if CSA company obtains a 50% settlement, as promised, the $500 debt ends up being settled for around $375 - $500, because CSA allowed the initial balance to grow while securing their own service fees from unsuspecting consumers.

31.     While consumers are waiting for these accounts to become "ripe" so that CSA can begin to make offers, consumers' credit is destroyed.  CSA fraudulently omits  to inform consumers that creditors and other third party debt collectors are unlikely wait 18-36 months to collect on debts, and instead file lawsuits against these consumers while they are enrolled in their programs, thus, rendering any "negotiation" of such debt futile.

32.     However, when consumers recognize this futility, CSA refers to their service contract to withhold money already paid by consumers.   Since the consumers were already in financial distress when they enrolled in CSA's Program, they can ill afford to lose thousands of dollars in CSA's fees, incur increased

balances, see their creditworthiness eroded, and in some cases defend themselves in court.

33.   As a result of CSA's debt settlement program, many consumers find themselves in far greater debt than when they enrolled in the program, with destroyed credit and out thousands of dollars in fees to Credit Solutions of America, the cause of this disastrous outcome.

34.   The fraudulent business practices employed by the CSA have a substantial likelihood of deceiving reasonable members of the public.   CSA promises debt salvation, and direct these representations toward members of the public suffering the most significant financial hardship.   CSA's promises of substantially reducing outstanding debt, as well as working towards repairing debtors' credit is a calculated method for attracting the most unaware and desperate consumers.

## FACTUAL ALLEGATIONS

35.   Sometime before or during April 2008, Plaintiff contacted Defendant after viewing Defendant's website, www.creditsolutions.com.

36.   On its website, CSA represents that it:

    a.    will help you get out of debt in as little as 12-36 months;

    b.    can settle your unsecured debt for up to 50%

    c.    can lower your monthly bills and pay off debt faster

    d.    has expertly trained employees negotiate on your behalf, helping you regain control of your finances

    e.    will do more than just settle debt.   We prepare our clients on how to remain debt-free moving forward by empowering them to make sound financial decisions.

    f.    will intercede on our client behalf with their creditors

37.   These same representations from CSA's website, were reiterated by an employee of CSA to Plaintiff in Plaintiff's initial contact with CSA.

HYDE & SWIGART
San Diego, California

38.   During Plaintiff's initial contact with CSA, Plaintiff informed CSA that she was current on all minimum payments to her creditors, but feared that she would struggle to continue making these payments. As such, none of Plaintiff's accounts had incurred any late fees, charge off fees, or increased interests rates due to a failure to make regularly scheduled minimum payments.

39.   CSA did not apprise Plaintiff of the fact that when a current account subsequently becomes delinquent, that account is subject to various late fees, increased interest rates, and charge-off fees when the account is deemed uncollectible and sent to a collection agency.  Further, CSA failed to apprise Plaintiff of the fact that the settlement percentage CSA would achieve for Plaintiff would not be based on the amount of outstanding debt submitted into the program, as that total outstanding debt would dramatically increase as Plaintiff continually failed to make monthly payments to creditors.

40.   In Plaintiff's initial contact with CSA, CSA represented to Plaintiff that by helping them reduce and eliminate their debts, their credit scores will improve after completion of CSA's Program.

41.   As part of the services offered to and paid for by Plaintiff, CSA advised Plaintiff to stop paying her debts, stop speaking with her creditors, and instead save up enough funds in an account which CSA had access to, and power of attorney over, so that CSA could negotiate settlements with Plaintiff's creditors.

42.   As a participant in CSA's Program, Plaintiff was required to execute an Electronic Funds Transfer Authorization which allowed CSA to access Plaintiff's bank account to debit its service fees.

43.   As a participant in CSA's Program, Plaintiff was required to execute a Limited Power of Attorney, granting CSA the authority "To proactively intercede and/or intervene and/or negotiate, mediate, or arbitrate the

HYDE & SWIGART
San Diego, California

1    settlement of any and all of my creditor claims, suits, liens, judgments, and/or

2    disputes."

44.   On or about April 20, 2008, Plaintiff agreed to CSA's standard form contract

of adhesion, and correlating enrollment documents to enter CSA's Program

(CSA's Contract").

45.   On or about August 21, 2009, Legal Recovery Offices, on behalf of Capital

One Bank (USA) N.A., filed a complaint against Plaintiff seeking to collect

on an account Plaintiff had enrolled in Defendant's program. When Plaintiff

enrolled the account with Defendant, the balance was $5,099.93.   At the time

Capital One Bank filed suit against Plaintiff, the balance of the alleged debt

was $6,476.71.  This represents a 27% increase in the outstanding balance on

this account.

**Credit Solutions of America, Inc.'s Contract**

46.   CSA's Contract is their standard contract that is used with all of CSA's

"clients."   Accordingly, the illegalities of CSA's Contract described herein

demonstrate that CSA systematically engages in unlawful activities and

continue to harm other members of the public.

47.   CSA's Contract contains an "Estimated Settlement Amount" that CSA

represented to Plaintiff was likely to be accepted by creditors in settlement of

the Plaintiff's debt, even though CSA has not communicated with any of

Plaintiff's creditors to make a reasonable inquiry as to the amount the creditor

would accept in settlement.

48.   CSA's Contract and or enrollment package provided that once Plaintiff had

actually saved an amount equal to 60% of the largest single debt enrolled with

CSA, CSA would to begin negotiating with Plaintiff's creditors to settle the

enrolled debts. Notably, CSA's Contract provides that CSA will not begin

negotiations with a consumers creditor until their initial Service Fee is paid in

full. This invariably means that when a consumer ceases making payments to

HYDE & SWIGART
San Diego, California

a creditor, as instructed by CSA, that consumer is not saving any money towards a potential settlement with that creditor, nor is that consumer making payments to that creditor for almost an entire year.  During this time in which creditors do not receive any payments on due and just debts, consumers liabilities and obligations to creditors significantly increase, and CSA receives a windfall of thousands of dollars from each of these consumers, while having never provided any service at the time they receive these payments.

49.   CSA's Contract provides that CSA will send letters Plaintiff's to Creditors "after your initial program start date (your start date is determined by the date of your initial payment to Credit Solutions)."  Consequently, CSA does not even consider contacting a clients creditors until the initial payment is completed.

50.   CSA's Contract does not guarantee that creditors will accept the Estimated Settlement Amount.  Rather, it provides that in the event that a creditor does not accept the Estimated Settlement Amount, CSA will negotiate the best settlement that it can for the consumer, provided the consumer has enough in personal savings to cover a higher settlement account.  If the consumer does not have adequate personal savings, CSA will cease negotiations until the consumer has sufficient personal savings.

51.   CSA's Contract purportedly provides a "Service Guarantee," which states that "if [CSA] is unable to settle an enrolled account, [CSA] will refund to CLIENT, an amount equal to 15% of that particular account balance at initial enrollment.  CLIENT must have sufficient funds to settle the account in order to be eligible for service guarantee."   This "guarantee" is incredibly misleading and deceives consumers into believing that if CSA is unable to deliver on its promise to dramatically reduce a consumers debt, it will refund that portion of CSA's service fee.  In actuality, the language of this paragraph creates circumstances so that CSA would never have to refund any portion

HYDE & SWIGART
San Diego, California

their service fee.  Presumably, CSA will always be able to settle an account for 99% of the outstanding balance - in other words - obtain at least a 1% discount.  This 1% discount would technically constitute a "settlement," as this is nonetheless a reduced balance.  However, if a consumer did not have 99% of that particular debt's balance, CSA could simply refer to this "service guarantee" to avoid returning a consumers service fee, even though CSA would clearly not be delivering on its promise to that consumer.

52. CSA's Contract provides that "COMPANY will notify CLIENT'S enrolled creditors within 72 hours of initial payment to COMPANY and request all telephone communications from creditors be directed the COMPANY corporate office."

53. Pursuant to CSA's Contract, Plaintiff's Estimated Settlement Plan Cost calculated by Defendant showed:

- Total Unsecured Debt                    $17,572.06
- Estimated Settlement Acount:            $7,028.80
- Credit Solutions Service Fee:           $2,635.80
- Total Debt Elimination Cost:            $9,664.60
- Estimated Monthly Budget Payments:      $268.46

54. CSA's Contract provides that "Credit Solutions charges a 15% service fee for all services provided."   Plaintiff's Service Fee Payment Schedule calculated by Defendant showed:

- Credit Solutions Total Service Fee      $2,635.80
- 3 Initial Payments [3 months] of:       $268.46
- Credit Solutions Initial Payment Total: $805.38
- Remaining Serve Fee Balance:            $1830.42
- 14 Monthly Service Fee Payments of:     $130.74
- Total Months to Payoff Service Fee:     17

55. CSA's Contract contains a section entitled "Estimated Personal Savings Plan For Payments to Creditors," which was calculated as follows:

HYDE & SWIGART
San Diego, California

| | |
|---|---|
| • Estimated Settlement Amount | $7,028.80 |
| • Savings Budget During Initial Payments | Optional |
| • Minimum Savings During Remaining | |
|   Service Fee Payments | $137.72 |
| • Minimum Personal Savings Payments | |
|   after Credit Solutions Fee is Paid | $268.46 |
| • Total Payments towards savings after | |
|   all payments | 19 |
| • Estimated Debt Free Time Frame | 36 months |

## Credit Solutions of America, Inc.'s Sales Scripts and Credit Advising Practices

56.     On information and belief, sales representatives for CSA use scripts provided to them by CSA in sales to consumers of CSA's services, and rebuttal scripts which contain scripted answers to common objections raised by consumers. The sales scripts include the following representations:

a.      In response to the question: "What is this going to do to my credit?" CSA offers a response that includes the erroneous information that negative effects on the consumer's credit caused by non-payment of their accounts will disappear within six months of the account being settled.  In fact, the negative effects of non-payment or late payments to an account can last as long as seven years.

b.      In this same scripted response, CSA fails to mention the negative effects of a charged-off account, a lawsuit, or a judgment on the consumers credit.   In addition, CSA recommends that the CSA employee respond to this inquiry with a "trick question," by asking the consumer "What's your current credit score?"  Since most consumers will not know, the employee can distract them from their original inquiry without providing an accurate response.  In fact, as part of this

HYDE & SWIGART
San Diego, California

HYDE & SWIGART
San Diego, California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

deflection, CSA instructs its employees to give the consumer more false information: "After you're out of the program, your score will be as good if not better than it is now . . ."

**CREDIT SOLUTIONS VIOLATIONS OF CALIFORNIA PRORATER LAW**

57.   As discussed above, CSA is a person or entity who, "for compensation, engages in whole or in part in the business of receiving money or evidences thereof for the purpose of distributing the money or evidences thereof among creditors in payment or partial payment of the obligations of the debtor," and is therefore a "Prorater" as that term is defined in Cal. Fin. Code § 12002.1.

58.   Cal. Fin. Code § 12200 provides that "[n]o person shall engage in the business, for compensation, of . . . receiving money as an agent of an obligor for the purpose of paying bills, invoices, or accounts of such obligor, or acting as a prorater . . . without first obtaining a license from the commissioner [of the California Department of Corporations]."  CSA has not obtained a license to act as a Prorater from the Commissioner of the Department of Corporations.  Accordingly, CSA's prorating activities are unlawful under Cal. Fin. Code § 12200.

59.   Cal. Fin. Code § 12314 provides regulation for the maximum charges that may be assessed by a prorater.  This statute provides, in pertinent part, that "[t]he total charges received by a prorater. . . may not exceed in the aggregate twelve percent (12%) for the first three thousand dollars ($3,000), eleven percent (11%) for the next two thousand dollars ($2,000), and ten percent (10%) for any of the remaining payments distributed by a prorater to the creditors of a debtor. . . ."  CSA charges a service fee equal to 15% of the total debt submitted into CSA's Program.   In and of itself, this total fee clearly violates California Prorater Law.  Not only does CSA's total service fee violate California Prorater Law, but because CSA requires payment of their service fees before disbursements of payments to Plaintiff's creditors,

1   this too violates California Prorater Law.  Accordingly, CSA has violated Cal.

2   Fin. Code § 12314.

3   60.   Cal. Fin. Code § 12314(a) provides that "an origination fee of a sum not to

4   exceed fifty dollars ($50) may be charged."  Plaintiff was required to pay

5   CSA $805.38 over the first 90 days of CSA's Program.   This "initial

6   payment(s)" or "origination fee" assessed by CSA clearly exceeds what is

7   legally permissible, thus, CSA has violated Cal. Fin. Code § 12314(a).

8   61.   Cal. Fin. Code § 12315 provides that "[a] prorater shall not receive any fee

9   unless he has the consent of at least 51% of the total amount of indebtedness

10  and of the number of creditors listed in the prorater's contract with the debtor,

11  or such like number of creditors have accepted a distribution of  p a y m e n t ."

12  CSA charged origination, and service fees prior to ever contacting Plaintiff's

13  creditors, thus, CSA has violated Cal. Fin. Code § 12315.  CSA  charged  and

14  received money for the performance of this service which CSA  has agreed to

15  perform for the Plaintiff before such service was fully performed.   This

16  money was to be paid, and was in fact paid, by Plaintiffs  prior to any service

    by CSA.

17  62.   Cal. Fin. Code 12314 provides that "[a]t least once each month the prorater

18  shall pay not less than 70 percent of all funds received from the debtor to the

19  creditors of the debtor."  CSA has an established policy of only considering

20  contacting Plaintiff's creditors after Plaintiff had paid the initiation fee of

21  $805.38.  Even after these initiation fees, as clearly seen on Plaintiff's

22  Payment  schedules above, only 51% of the money Plaintiff contributed to

23  CSA's program would be applied towards setting accounts with Plaintiff's

24  creditors, while the remainder would be applied to CSA's continuing service

25  fees for 16 months after CSA's initiation fee. Therefore, CSA violated Cal.

26  Fin. Code § 12314.

27  63.   CSA's Contract provides that "COMPANY will notify CLIENT'S enrolled

28  creditors within 72 hours of initial payment to COMPANY and request all

HYDE & SWIGART
San Diego, California

1    telephone communications from creditors be directed the COMPANY

2    corporate office." CSA failed to notify, in writing, all creditors listed in

3    Plaintiff's contract of Plaintiff's desire to engage a prorater's services within

4    five days of the effective date of the contract, in violation of Financial Code §

5    12315.1. This is clearly ascertainable based on CSA's policy of non-action

6    until its initiation fee (which is paid over the first three months of CSA's

7    program) is paid.

64.    Cal. Fin. Code § 12311 provides that "no licensee shall advertise. . . or cause

to permit to be advertised. . . in any manner whatsoever, any statement or

representation which is false, misleading, or deceptive, or which omits to

state material information. . . ." CSA, through their website and in-person

contacts with Plaintiff, made the following material misrepresentations and

material omissions of fact:

a.    CSA has not obtained a license to act as a prorater from the
State of California.

b.    Creditors will continue to assess interest, late fees, over-limit charges,
and any other fees associated with the account. As a result, at the time
that a settlement is reached, the consumer owes significantly more on
their account, thus reducing the actual savings.

c.    Because they are no longer receiving monthly payments, creditors will
likely engage in collection activities which may include repeated
phone calls and other correspondence. Over time, these activities can
increase, especially as the consumer's account may get transferred to a
collection agency.

d.    Once a consumer stops paying on their accounts, the creditor may file
a lawsuit against the consumer for breaking their contract.

e.    Creditors are under no obligation to accept, or even entertain,
CSA's settlement offer.

**HYDE & SWIGART**
San Diego, California

f.   The consumers credit reports will reflect the late charges and non-payment of their unsecured debt.   As a result, the consumer's credit score will drop while participating in the program and the consumer may experience the long term effects of a low credit score, which can include difficulty in buying a house or car, obtaining insurance, or obtaining employment.

g.   Even credit cards that are not enrolled in CSA's program, and are not delinquent, may be cancelled by creditors because of information sharing between these companies and various credit reporting bureaus, substantially depriving consumers of necessary financial resources.

h.   CSA dramatically overstates its ability to settle a consumers debt, while simultaneously deceiving consumers into believing that the consumer would be unable to perform similar tasks.

i.   CSA misrepresents and exaggerates the purported positive effects CSA's Program will have on consumers credit once the program is completed.

j.   CSA fails to disclose that debt settlement will cause good and even fair credit scores to drop precipitously, and that reports of late payments, charge offs, lawsuits, and judgments can remain on their credit report for years.

These misleading and deceptive business practices of Defendant, as well as the foregoing material omissions of CSA, violate Cal. Fin. Code § 12311.

65.   Cal. Fin. Code § 12316 provides that "[i]f a prorater contracts for, receives or makes any charge in excess of the maximum permitted by this division, except as the result of an accidental and bona fide error, the proraters contract with the debtor shall be void and the prorater shall return to the debtor all charges received from the debtor. Accordingly, based on the foregoing multiple violations of California law, Plaintiff's contract with CSA, as well as all California consumers who entered into similar agreements with CSA,

HYDE & SWIGART
San Diego, California

1   should be deemed rescinded, and all money paid Plaintiff and California

2   residents for CSA's' service fees should be returned.

3

4                    **CLASS ACTION ALLEGATIONS**

5   66.   Plaintiff brings this Class action against CSA for her claims under the Unfair

6         Competition Law.   Plaintiff also alleges violations of CLRA, CROA and

7         further brings this action under theories of Tort in Essence and Negligence Per

8         Se, both of which are predicated on CSA's violations of California Prorater

9         Law.   Plaintiff, individually, and on behalf of those similarly situated, seeks

10        declaratory relief, injunctive relief, restitution, actual damages, statutory

11        damages, and punitive damages against CSA.

12                              *The Class*

13  67.   "Class One" consists of all persons in California who in the four years

14        preceding the filing of this Complaint (1) have engaged the Debt Settlement /

15        Prorating services of CSA, (2) wherein CSA was unlawfully operating as a

16        Prorater in the State of California, (3) who paid CSA's service fee, or any

17        portion thereof, or compensation of any kind to CSA in exchange for CSA's

18        Debt Settlement / Prorating services.

19  68.   "Class Two" consists of all persons in California who in the four years

20        preceding the filing of this Complaint (1) have engaged the credit repair

21        services of CSA, (2) wherein CSA received service fees of any kind from said

22        persons, (3) wherein CSA failed to fully perform such services prior to

23        receiving service fees of any kind.

24  69.   "Class Three" consists of all persons in California who in the four years

25        preceding the filing of this Complaint (1) have engaged the credit repair

26        services of CSA, (2) wherein CSA failed to provide said persons the notice

27        required by 15 U.S.C. § 1679c.

28  70.   The Classes excludes CSA, their employees and agents.

**HYDE & SWIGART**
San Diego, California

71.   Plaintiff is unable to state the precise number of proposed Class members in The Class because that information is in CSA's possession, however, because said class would include each and every California consumer who has procured CSA's services through agreement to CSA's Contract, the numbers are sufficient to satisfy any numerosity requirement for Class actions in California.

72.   Plaintiff believes that joinder of all Class members would be impracticable.

73.   The identities of Class members can be ascertained through CSA's records.

74.   Questions of law and fact of common and general interest to The Classes exist as to all members of The Classes and predominate over any questions affecting only individual members of the Classes because of the fact that this Class Action is based on CreditAnswers unlawful Prorating and Credit Repair activities, and the only legal and factual questions to be decided are whether:

a.   CSA is a prorater under California Prorater Law;

b.   CSA is a "credit repair organization" within the meaning of 15 U.S.C. § 1679(a)(3);

c.   CSA's Prorating activities are in violation of California Prorater Law;

d.   CSA's credit repair activities violate the Credit Repair Organizations Act.

75.   Because Plaintiff engaged the prorating services of CSA and paid money to CSA in the form of service fees and maintenance fees, Plaintiff's claims are typical of the claims of Class One.    Because Plaintiff engaged the credit repair services of CSA, paid service fees to CSA prior to CSA's performance of any credit repair activities, Plaintiff's claims are typical of the claims of Class Two.  Because Plaintiff engaged the credit repair services of CSA, and CSA failed to furnish Plaintiff the notice required by 15 U.S.C. § 1679c, Plaintiff's claims are typical of the claims of Class Three.

76.   Plaintiff will fairly and adequately represent the interests of The Class in that she has no interests antagonistic to The Class.  Plaintiff has retained counsel

HYDE & SWIGART
San Diego, California

competent and experienced in the prosecution of class action litigation, consumer rights litigation, and litigation based on California Prorater Law.

77. Plaintiff and members of The Class were harmed by the acts of Defendant in at least the following ways:

a. Because CSA is unlawfully acting as a Prorater, as well as a Credit Repair Organization, and because CSA's contract violates numerous provisions of California Prorater Law, as well as CSA's numerous material misrepresentations and omissions of material fact, CSA unlawfully acquired money from Class Members who agreed to the Terms of CSA's Contract, and paid CSA's service fee pursuant to said contract, or any portion thereof.

78. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the restitution owed to each individual member is relatively small compared to the expense and burden of prosecuting individual cases.

79. If individual Class members were required to bring separate actions, courts throughout California would be confronted by a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contract to proceeding on a case by case basis, in which inconsistent rulings will magnify the delay and expense to all parties and the court system, this Class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

80. In addition, because very few attorneys in California are experienced or knowledgeable about California Prorater Law or its requirements, it is extremely unlikely that persons harmed by CSA's Contracts would ever recover anything unless this case proceeds as a Class action.

///

HYDE & SWIGART
San Diego, California

HYDE & SWIGART
San Diego, California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### VIOLATIONS OF THE CALIFORNIA BUSINESS AND PROFESSIONAL CODE SECTION 17200 *ET SEQ.* (UCL)

81. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

82. Plaintiff has standing to sue under the UCL pursuant to Cal. Bus. & Prof. Code § 17204, which provides in pertinent part, "[a]ctions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by. . . a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." *See Californians For Disability Rights v. Mervyn's, LLC* (2006) 39 Cal. 4th 223, 227.  As discussed above, Plaintiff has suffered various injuries directly and proximately resulting from CSA's unlawful, unfair, and fraudulent business practices.  Specifically, Plaintiff suffered an injury in fact in the form of lost monies unlawfully acquired by CSA as a result of CSA's unlawful business practices.

83. The practices prohibited by the UCL are "any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made [and] [i]t is not necessary that the predicate law provide for private civil enforcement."  *Wang v. Massey Chevrolet,* (2002) 97 Cal. App. 4th 856, 871.  As stated by our Supreme Court, the UCL 'borrows' violations of other laws and treats them as unlawful practices independently actionable under the UCL.  *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal. 4th 377, 383; *South Bay Chevrolet v. General Motors Acceptance Corp.*, (1999) 72 Cal.App.4th 861, 880, *Wang v. Massey Chevrolet* (2002) 97 Cal. App. 4th 856, 871.

84. Each and every violation of California Prorater Law discussed above, constitutes multiple violations of the Unfair Competition Law.   Additionally,

CSA's acts and practices as alleged in this Complaint constitute unlawful, unfair, and/or fraudulent business practices in violation of the UCL.

85.   CSA engaged in unlawful business practices by, among other things:

a.   engaging in conduct, as alleged herein, that violated California Prorater Law, the Consumer Legal Remedies Act, and the Credit Repair Organizations Act.

86.   CSA engaged in unfair business practices by, among other things:

a.   engaging in conduct, as alleged in this Complaint, where the utility of that conduct is outweighed by the gravity of the consequences to Plaintiff and the Class members;

b.   engaging in conduct, as alleged in this Complaint, that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers;

c.   engaging in conduct that undermines or violates the stated policies underlying the California Prorater Law, the Consumer Legal Remedies Act, and the Credit Repair Organizations Act.

87.   CSA engaged in fraudulent business practices by engaging in conduct that was and is likely to deceive consumers acting reasonably under the circumstances.   CSA's fraudulent business practices include but are not limited to:

a.   CSA has not obtained a license to act as a prorater from the State of California;

b.   Creditors will continue to assess interest, late fees, over-limit charges, and any other fees associated with the account.  As a result, at the time that a settlement is reached, the consumer owes significantly more on their account, thus reducing the actual savings;

c.   Because they are no longer receiving monthly payments, creditors will likely engage in collection activities which may include repeated phone calls and other correspondence.  Over time, these activities can

increase, especially as the consumer's account may get transferred to a collection agency;

d.  Once a consumer stops paying on their accounts, the creditor may file a lawsuit against the consumer for breaking their contract;

e.  Creditors are under no obligation to accept, or even entertain, CSA's settlement offer;

f.  The consumers credit reports will reflect the late charges and non-payment of their unsecured debt. As a result, the consumer's credit score will drop while participating in the program and the consumer may experience the long term effects of a low credit score, which can include difficulty in buying a house or car, obtaining insurance, or obtaining employment;

g.  Even credit cards that are not enrolled in CSA's program, and are not delinquent, may be cancelled by creditors because of information sharing between these companies and various credit reporting bureaus, substantially depriving consumers of necessary financial resources;

h.  CSA dramatically overstates its ability to settle a consumers debt, while simultaneously deceiving consumers into believing that the consumer would be unable to perform similar tasks;

i.  CSA's requirement that consumers pay substantial up-front fees before CSA will perform any promised services, despite CSA's knowledge that any consumer enrolled in CSA's program is undergoing substantial financial problems;

j.  CSA misrepresents and exaggerates the purported positive effects CSA's Program will have on consumers credit once the program is completed.

k.  CSA fails to disclose that debt settlement will cause good and even fair credit scores to drop precipitously, and that reports of late payments,

HYDE & SWIGART
San Diego, California

HYDE & SWIGART
San Diego, California

charge offs, lawsuits, and judgments can remain on their credit report for years.

88. As a result of these violations, Plaintiff is entitled to restitution of all monies paid to CSA pursuant to Cal. Bus. & Prof. Code § 17203.

89. Plaintiff is entitled to an injunction to stop CSA's unlawful activities and the irreparable harm CSA has caused to Plaintiff and to other members of the public pursuant to Cal. Bus. & Prof. Code § 17203.

90. Plaintiff is entitled to reasonable attorney's fees together with the costs of suit.

## SECOND CLAIM FOR RELIEF

## VIOLATIONS OF CONSUMERS LEGAL REMEDIES ACT

91. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

92. In concealing the material fact that the CSA is not licensed to do business as a Prorater in the State of California, CSA violated Cal. Civ. Code § 1770(a)(2) by misrepresenting the source, sponsorship, approval, or certification of goods or services.

93. In concealing the material fact that the CSA was not licensed to do business as a prorater in the State of California, CSA violated Cal. Civ. Code § 1770(a)(3) by misrepresenting certification by the State of California.

94. In concealing the material fact that CSA is not licensed to do business as a prorater in the State of California, as well as the numerous misrepresentations and omissions of material fact discussed above, CSA violated Cal. Civ Code § 1770(a)(7) by representing that services are of a particular standard, quality, or grade, when they are of another.

95. CSA's Contract calls for limitations of Plaintiff's remedies that are in violation of Cal. Civ. Code § 1770(a)(19) by inserting an unconscionable provision into the contract.

96.    Pursuant to Cal. Civ. Code § 1780, Plaintiff is entitled to restitution, injunctive relief, punitive damages as the court may allow, and reasonable attorneys fees.

### THIRD CLAIM FOR RELIEF
### VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT
### 15 U.S.C. § 1678, *et seq.*

97.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

98.    CSA is a "credit repair organization" within the meaning of 15 U.S.C. § 1679 (a)(3) because it expressly *and/or impliedly* represents that it will provide services that will improve the credit records, histories, or scores of its customers in exchange for compensation.    CSA also expressly and/or impliedly represents that it will advise or assist consumers in improving their credit scores, histories, or scores in exchange for compensation.

99.    CSA charged and/or received fees from Plaintiff and the class for services that CSA agreed to perform before those services were fully performed in violation of 15 U.S.C. § 1579b(b).

100.    CSA failed to provide to the Plaintiff and the class the notice required pursuant to 15 U.S.C. § 1679c to inform consumers of their rights under federal and state law before entering into contracts or agreements.

101.    CSA failed to provide to the Plaintiff and the class a full and detailed description of the services it would perform, and estimate of the date those services would be performed, and an estimate of the length of time necessary to complete those services as required by 15 U.S.C. § 1679d(b)(2).

102.    Plaintiff and the class are entitled to compensatory damages of no less than the fees they paid to CSA, attorneys' fees and costs, and punitive damages pursuant to 15 U.S.C. § 1679g.

HYDE & SWIGART
San Diego, California

HYDE & SWIGART
San Diego, California

**FOURTH CLAIM FOR RELIEF**

**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

103. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

104. CSA was aware that Plaintiff, and other Class Members had contractual relations with various creditors.

105. CSA intentionally interfered with the contractual relations of Plaintiff and Class Members with their respective creditors by encouraging Plaintiff and Class Members to cease making monthly payments on their contractual obligations.

106. CSA intended to cause Plaintiff and Class Members contractual relations with their creditors to end for her own financial gain.

107. CSA succeeded in causing Plaintiff and Class Members contractual relations with their creditors to end, and succeeded in achieving a significant financial gain as a result of CSA's wrongful acts;

108. As a proximate result of CSA's tortuous interference with Plaintiff and Class Members contractual relations, Plaintiff and Class Members have been damaged in the form of late fees, higher interest rates, charge off fees, delinquency penalties, and in some instances, being forced to defend lawsuits resulting from their breach, which was actively encouraged by CSA for its own personal gain.

**FIFTH CLAIM FOR RELIEF**

**TORT IN ESSENCE**

109. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

110. A tort in essence is the breach of a nonconsensual duty owed another. *Laczko v. Jules Meyers, Inc.,* (1969) 276 Cal. App. 2d 293, 295. Violation of a statutory duty to another may therefore be a tort. *Id.* A violation of a statute

HYDE & SWIGART
San Diego, California

embodying a public policy is generally actionable even though no specific civil remedy is provided in the statute itself. *Id.* Any injured member of the public for whose benefit the statute was enacted may bring the action. *Id.*

111. Plaintiff, a consumer of Prorater services, was entitled to a duty of care by CSA, a provider of Prorating services who provided prorating services to Plaintiff. The duty owed by CSA to Plaintiff is provided by the California Legislature in California Prorater Law.

112. CSA breached said non-consensual duties in that CSA violated the aforesaid California Prorater Law.

113. CSA's conduct was malicious, willful, fraudulent and oppressive, done with a conscious disregard for Plaintiff's rights and with the intent to injure Plaintiff thereby justifying the awarding of punitive damages.

114. As a direct and proximate result of the foregoing, Plaintiff has suffered injuries including but not limited to, financial loss, diminished credit capacity, mental and emotional distress and is entitled to damages against CSA, including but not limited to general and punitive damages in an amount according to proof.

### SIXTH CLAIM FOR RELIEF
### NEGLIGENCE PER SE

115. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

116. Cal. Evidence Code § 669(a) states that the failure of a person to exercise due care is *presumed* if he (1) violated a statute, ordinance, or regulation of a public entity; (2) The violation proximately caused injury to person or property; (3) The injury resulted from an occurrence of the nature of which the statute, ordinance, or regulation was designed to prevent; and (4) The person suffering the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

117. Plaintiff, a consumer of Prorater services, was entitled to a duty of care by CSA, a provider of Prorating services who provided prorating services to Plaintiff.   The duty owed by CSA to Plaintiff is provided by the California Legislature in California Prorater Law.   CSA systematically violated the California Prorater Law, statutes and/or regulations promulgated under the California Financial Code, overseen and enforced by the Commissioner of the California Department of Corporations.

118. Plaintiff suffered an injury in fact, in the form of money unlawfully acquired by CSA.  Plaintiff's injury was proximately caused by CSA's use of contracts that systematically violated California Prorater Law.  In other words, but for the CSA's use of unlawful contracts, CSA would not have unlawfully acquired money from Plaintiff, and Plaintiff would not have been injured by CSA's unlawful conduct.

119. The regulations promulgated under California Prorater Law were designed to prevent overreaching Proraters and other entities engaged in the business of Prorating from demanding excessive sums of money in exchange for prorating services.  Plaintiff's injury clearly resulted from an occurrence of the nature of which California Prorater Law was designed to prevent.

120. California Prorater Law was adopted to protect California Consumers from the oppressive and overreaching practices of those entities engaged in the business of prorating.  Plaintiff, a California Consumer who in fact engaged the services of a Prorater, clearly was within the contemplated class of individuals sought to be protected by California Prortater Law.

121. CSA breached said duties in that CSA violated the aforesaid California Prorater Law.

122. The negligence of CSA was the proximate and legal causes of the damages sustained by Plaintiff.  Plaintiff has incurred damages in an amount according to proof.

### SEVENTH CLAIM FOR RELIEF
### DECLARATORY RELIEF

123. An actual controversy has arisen and now exists relating to the rights and duties of the parties in that Plaintiff contends that CSA is a "Prorater" as that term is defined by Cal. Fin. Code § 12002.1., thus, CSA is unlawfully operating as a Prorater in California.   Plaintiff is informed and believes that CSA will contend it is not a Prorater subject to California Prorater Law. Additionally, Plaintiff contends that CSA is a "Credit Repair Organization," as that term is defined by 15 U.S.C. § 1679(a)(3), thus, CSA is unlawfully operating as a Credit Repair Organization.   Plaintiff is informed and believes that CSA will contend it is not a Credit Repair Organization, and is not required to comply with the Credit Repair Organizations Act.

124. Plaintiff desires a declaration as to whether CSA is a "Prorater," and additionally, whether CSA is a "Credit Repair Organization."   A judicial declaration is necessary and appropriate at this time so that Plaintiff may ascertain her rights and duties, and the rights and duties of CSA.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that judgment be entered against CSA, and Plaintiff be awarded damages from CSA, as follows:

**FOR ALL CAUSES OF ACTION:**

1. Certification of this action as a class action pursuant to Fed, R. Civ. P. 23

2. That the Contract be adjudged rescinded and canceled;

3. A permanent injunction prohibiting CSA from engaging in any debt resolution, debt negotiation, debt settlement or any other consumer oriented financial services until CSA satisfies the Court that they have implemented procedures to insure that all required licenses are filed, disclosures are made, and all mandatory procedures and regulations promulgated under California Prorater Law are complied with and enforced;

4. Restitution of all consideration paid by Plaintiff;

5.      Actual damages in an amount according to proof;

6.      For punitive/exemplary damages in an amount according to proof;

7.      For costs of suit incurred herein;

8.      Reasonable attorney's fees according to proof;

9.      For such other relief as the Court deems proper

## TRIAL BY JURY

10.     Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

Date: February 10, 2010                         **Hyde & Swigart**

                                                By: /s/ Robert L. Hyde
                                                Robert L. Hyde
                                                Attorneys for the Plaintiff